# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case No.: 3:17-cr-225-J-32MCR

HERACLIO GUTIERREZ
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on the Defendant's Motion to Suppress

(the "Motion") (Doc. 43), and the Government's response in opposition thereto

(Doc. 51).

## I.      Background

On October 19, 2017, law enforcement officers with the Drug Enforcement

Administration ("DEA") arrested the Defendant based upon evidence obtained in

an extensive drug trafficking investigation.  On the same date, the Government

presented a Criminal Complaint and affidavit to the undersigned.  Upon review of

DEA Special Agent Jeff Crook's ("SA Crook") affidavit in support of the

Complaint, the undersigned found probable cause to issue the Complaint against

_____

[1] "Within 14 days after being served with a copy of [this Report and Recommendation],
a party may serve and file specific written objections to the proposed findings and
recommendations."  Fed. R. Crim. P. 59(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla.
R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions
of the report or specified proposed findings or recommendations to which objection is
made."  28 U.S.C. § 636(b)(1).

the Defendant for conspiracy to distribute methamphetamine between July 2017 and October 2017.  (Doc. 1.)  On November 16, 2017, a federal grand jury returned a one-count indictment charging the Defendant and another individual with conspiracy to distribute methamphetamine, in violation of 21 United States Code Sections 841(b)(1)(A) and 846.  (Doc. 19.)

On March 23, 2018, the Defendant filed the instant Motion seeking to suppress all evidence seized during the search of a vehicle in connection with the Defendant's arrest, as well as all ping data used prior to the Defendant's arrest.  This matter was referred to the undersigned for a report and recommendation on March 26, 2018.  On April 5, 2018, the Government responded to the Motion.  (Doc. 51.)  The suppression hearing was held on July 9, 2018.

On July 3, 2018, however, the Government filed a motion to quash certain subpoenas issued by the Court in connection with the Defendant's *ex parte* motion.  (Doc. 85.)  The Government sought to quash subpoenas issued to multiple law enforcement officers and two co-conspirators whom the Defendant believed had relevant testimony to the suppression issues presented.  (*Id.*)  The Court entered an order taking the motion to quash under advisement, and directed the Defendant to respond to the motion in writing.  (Doc. 87.)  The Defendant filed his written response on July 7, 2018.  (Doc. 88.)  The undersigned addressed the motion to quash immediately prior to the suppression

2

hearing (*see generally* Doc. 91)[2] and issued an oral order granting in part and denying in part the motion to quash.  (Doc. 89.)  The evidentiary hearing on the motion to suppress commenced thereafter, whereby the parties made arguments and presented testimony.  For the reasons explained below, the undersigned respectfully recommends that the Defendant's Motion be **DENIED**.

## II.    Evidence Presented at the Hearing

During the evidentiary hearing, the Government presented the testimony of three witnesses: DEA Task Force Officer Donovan Yarborough ("TFO Yarborough"), who participated in the investigation of the Defendant; Patrol Sergeant Christopher Walker ("PS Walker") of the Baker County Sheriff's Office ("BCSO"), whose K-9 conducted a drug sniff of the Defendant's vehicle subsequent to his arrest; and SA Crook, who submitted the sworn affidavit to the undersigned in support of the Complaint.  The Government also entered four (4) exhibits into evidence that included the two ping data orders obtained during the investigation (Docs. 89-1 & 89-2), the Complaint (Docs. 1 & 89-3), and the K-9 certification of PS Walker (Doc. 89-4).

The Defendant called an unusual amount of witnesses to the stand for a traffic stop suppression matter.[3] Unfortunately for the Defendant, none of them

---

[2] The transcript will hereinafter be cited as "Tr." followed by the appropriate page number.

[3] The Defendant subpoenaed fifteen (15) individual law enforcement officers (including a dispatcher), along with a representative of Bank of America and U-Haul.  The

provided pertinent testimony to the suppression issues at hand.  Initially, the

undersigned agreed (for the most part) with the Government's motion to quash.

(*See, e.g.,* Tr. 6 ("Ms. Hackenberry: The only issues that remain before the Court

are . . . the search of the [D]efendant's vehicle and the seizure of the items from

his vehicle, and then the legality of the ping orders that were issued that enabled

law enforcement to obtain that data."), 10 (noting that the Defendant bears the

burden of articulating specific facts showing a requested witness's testimony is

relevant and necessary), 27 ("Ms. Hackenberry: That's the thing, Your Honor, is

that [] this [is] just a mechanism to call people to the stand to point out some

inconsistency that is of no consequence.  Right?  The [D]efendant was arrested

that day.  His vehicle was seized under multiple different theories, but there was

– and the Court found[,] probable cause [supporting the Criminal Complaint].  So

I'm having a hard time following why we're putting all of these people on the

stand.  The Court: I am too, Counsel.").)  However, the undersigned allowed

---

Defendant also moved for a writ of habeas corpus ad testificandum for the two alleged
co-conspirators.  At the hearing, the Defendant's counsel called the following law
enforcement members to testify: (1) Andrea Grasso-Burros, (2) Darryl Hickox, (3)
Matthew Bowen, (4) Richard Crews, (5) Thomas Dyal, (6) Michael Hauge, (7) Michael
Mayer, (8) Austin Graham, (9) Victoria McKenzie (who was not subpoenaed), (10)
Rebecca Williams, and (11) Mitchell Wight.  The Court precluded the Defendant from
calling the following individuals to the stand: (1) alleged co-conspirator Dustin Whittaker,
(2) alleged co-conspirator Luisana Ramirez-Chavez, (3) law enforcement officer Chad
Montean, (4) law enforcement officer Russell Clark, and (5) the Defendant's ping
technology expert Robert Wyman.  (Doc. 89.)  The Defendant also recalled Government
witness TFO Matthew Yarborough to testify.

significant leeway for the Defendant's counsel to call eleven (11) law enforcement witnesses that he proffered would provide relevant testimony.  (Tr. 28 ("However, th[e witnesses] are here, and what I will do is deny the motion to quash at this point and allow the testimony to proceed; however, with regard to your examination of these witnesses, Mr. Dunn, as indicated before, we're not trying this case . . . And I will hold you to strict relevancy.  And if you go beyond that, I'm going to cut you off.").)

    As the suppression hearing continued, it became abundantly clear to the undersigned that the Defendant's counsel was utilizing the suppression hearing to conduct a discovery fishing expedition, rather than to challenge the legality of the search/seizure or the ping orders.  Counsel for the Defendant took copious handwritten notes during his direct examination of the witnesses, causing extensive delay between questions propounded.  (Tr. 188 ("Counsel, let's move on.  You're taking copious notes.  We got a transcript here if you want to get a copy of it.")  He also attempted to continuously broaden the scope of the suppression hearing despite being cautioned to stay on topic multiple times, including side bar (Tr. 137 ("Mr. Dunn, we['ve been] through this over and over again.  I'm losing my patience.  Now, there was a probable cause determination that was made.  We have to stay within the four corners of that document.  Can't go beyond that.  That's not the purpose of this hearing.").)  Notwithstanding this fact, the Defendant's counsel then improperly attempted to turn the suppression

5

hearing into a *Franks* and *Daubert* hearing.[4]  (Tr. 7-8, 18-21, 60-61, 90, 133-34, 168, 196-204.)  Thus, the undersigned limited the scope of most defense witnesses's testimony and excluded witness testimony deemed cumulative, irrelevant, and/or improper.  Although the undersigned considered the testimony of the witnesses called by the Defendant, the undersigned finds it unnecessary to address their testimony in detail in this Report and Recommendation.  The undersigned summarizes the relevant testimony below.

TFO Yarborough, SA Crook, and Task Force Officer Michael Hague ("TFO Hague") were co-case agents performing an investigation of the Defendant.  (Tr. 37-38.)   During their investigation, the officers received information from a confidential source that the Defendant was involved in the distribution of crystal methamphetamine.  (Tr. 43.)  This information included: (a) identification of the Defendant as the supplier of crystal methamphetamine seized during a storage unit raid; (b) confirmation of the Defendant's plan to arrive in Jacksonville within a few days for potential delivery of more methamphetamine; and (c) identification of the active T-Mobile cell phone number used by the Defendant to facilitate drug trafficking communications.  (Docs. 89-1, 89-2.)  The officers also observed the

---

[4] The Defendant failed to make the requisite preliminary showing under *Franks v. Delaware*, 438 U.S. 154 (1978).  *See United States v. Barsoum*, 763 F.3d 1321, 1329 (11th Cir. 2014) ("*Franks* requires that a defendant make a substantial *preliminary* showing that statements or omissions are intentionally false or recklessly misleading, and that those statements or omissions altered the probable cause showing.") (emphasis in original).

Defendant purchase a vehicle with what they believed to be drug proceeds.  (Tr. 42-44.)

Based on the information learned during the investigation, TFO Hague then submitted an application to state circuit judge Marianne Aho on August 22, 2017, requesting the court to enter an order authorizing ping data (latitude and longitude data) to be retrieved from the Defendant's cell phone from August 22, 2017 to September 22, 2017.  (Tr. 31; Doc. 89-1.)  The affidavit submitted by TFO Hague alleged that the Defendant was using a particular phone to facilitate illegal drug trafficking activities.  (Tr. 31-32; Doc. 89-1 at 1-2.)  Judge Aho found probable cause existed, and entered an order authorizing ping data to be retrieved from the phone.  (Doc. 32-33; Doc. 89-1.)  TFO Hague then submitted a second application to Judge Elizabeth Senterfitt, a state circuit court judge, on September 18, 2017, seeking to extend the ping data retrieval.  (Tr. 33; Doc. 89-2.)  Judge Senterfitt also found probable cause and entered an order authorizing ping data to be retrieved from the Defendant's phone from September 22, 2017 to October 22, 2017.  (Tr. 33-35; Doc. 89-2.)  Similar orders were issued for the phone belonging to alleged co-conspirator Luisana Ramirez-Chavez.  (Doc. 89-3 at 4-5.)

Having received this information, law enforcement officers conducted a traffic stop on Ms. Ramirez-Chavez on October 9, 2017.  (Doc. 89-3 at 7.)  A K-9 sniff of her vehicle alerted to the presence of narcotics.  (*Id.* at 8.)  Ms. Ramirez-

Chavez was subsequently arrested and officers later discovered methamphetamine in a hidden compartment in the vehicle.  (Doc. 89-3 at 8; Tr. 36, 42.)  Upon questioning, Ms. Ramirez-Chavez implicated the Defendant in the illegal drug activity.  (Doc. 89-3 at 8.)  At that point, a decision was made to apprehend the Defendant when he next traveled to the Middle District of Florida. (Tr. 36.)

The ping data retrieved from the Defendant's phone allowed law enforcement officers to determine that he was traveling from Texas to Jacksonville on October 17, 2017.  (Tr. 35.)  The officers also observed the Defendant traveling on Interstate 10 from Arizona to Jacksonville.  (Tr. 37.)  On the night of October 17, 2017, members of the investigating team observed the Defendant meeting with Mitchell Loor, a co-defendant in the case.  (Tr. 38.)  Both individuals traveled to a nearby hotel where the Defendant stayed prior to departing on October 19, 2017.  (*Id.*)

On October 19, 2017, members of the investigating team learned that the Defendant was leaving Jacksonville.  (Tr. 64-65.)  TFO Yarborough was assigned to a special detail in Gainesville at that time, and was unable to participate in the Defendant's arrest.  (Tr. 37, 64-65.)  As such, TFO Yarborough coordinated with SA Crook to effectuate the Defendant's arrest.  (Tr. 38.)  SA Crook then contacted Detective Ricky Crews with BCSO and advised him of the plan to make a probable cause arrest of the Defendant.  (Tr. 65.)  SA Crook

provided Detective Crews with a vehicle description, updated him with the Defendant's ping location data, and then instructed him to stop the Defendant's vehicle once found.  (Tr. 65, 78.)  Detective Crews then worked with his team of officers to locate the subject vehicle.  (Tr. 110.)  Detective Thomas Dyal ("Detective Dyal"), a member of the team, first observed the vehicle and communicated with Deputy Mitchell Wight ("Deputy Wight") to identify and stop the vehicle.  (Tr. 111, 122.)

Between 7:00 and 7:15 a.m. that morning, Deputy Wight performed a traffic stop of the Defendant's vehicle on Interstate 10 for speeding.  (Tr. 183, 190.)  Although Deputy Wight developed independent probable cause to stop the vehicle for speeding, his plan was to stop the vehicle (regardless of the traffic infraction) based on the instruction he received.  (Tr. 190-92.)  When the Defendant's vehicle came to a complete stop, Deputy Wight approached the passenger side.  (Tr. 184.)  At that point, Detective Dyal walked to the driver's side of the vehicle, escorted the Defendant to the rear of his vehicle, and handcuffed him.  (Tr. 125, 188.)  The Defendant was placed in Deputy Wight's police cruiser and driven to BCSO.  (Tr. 186-87, 189.)  There, the Defendant was placed in the interview room and read his *Miranda* rights.[5]  (Tr. 189-90.)

---

[5] The Defendant did not provide any post-arrest statements to law enforcement officers. (Tr. 8.)

In the meantime, another detective drove the Defendant's vehicle to BCSO, in part, to inventory the vehicle incident to the Defendant's arrest.[6]  (Tr. 120, 125.)  At BCSO, Detective Crews walked his K-9 around the vehicle and the K-9 alerted to the presence of narcotics.  (Tr. 117-18.)  Because Detective Crews lacked the requisite certification for his K-9, PS Walker also walked his K-9 "Blitz" around the perimeter of the vehicle.  (Tr. 56-57, 66-67, 82, 118.)  Blitz also alerted to the presence of narcotics.  (Tr. 56-57, 66-67, 118.)  The officers then searched the vehicle and found a sum of cash and a handgun (but no drugs) located in a suitcase within the vehicle.  (Tr. 116.)

### III.    Analysis

Because a Complaint supported by probable cause was issued in this case, the only suppression issues before the Court are whether the Defendant was lawfully arrested without a warrant, whether his vehicle was lawfully seized and searched without a warrant, and whether the ping orders were lawfully obtained.  The undersigned addresses each issue below.

### A.    The Defendant's Warrantless Arrest Was Proper

The Defendant first argues that the initial stop and his arrest were improper.  Specifically, the Defendant argues that Deputy Wight had no authority

---

[6] The officers believed they had probable cause to search the vehicle incident to the Defendant's arrest because the Defendant had utilized drug proceeds to purchase the vehicle, and because they found drugs in a hidden compartment in alleged co-conspirator Ms. Ramirez-Chavez's vehicle.  (Tr. 41-44, 47-50, 66, 80-81, 120-21.)

to stop his vehicle and to arrest him despite being instructed to do so, since Deputy Wight had no personal knowledge of the facts giving rise to his arrest. The Defendant cites no relevant legal authority (in his memorandum or at the hearing) supporting his argument, and the undersigned disagrees with his view of the law.

It is important to note initially that Deputy Wight observed the Defendant driving 79 miles per hour in a 70-mile per hour speed zone.  (Tr. 183, 190.)  Thus, it appears that Deputy Wight had independent, reasonable suspicion to stop the Defendant's vehicle and to arrest him.[7]  *See Rodi v. Rambosk*, No. 2:13-cv-556-FtM-29CM, 2014 WL 1876218, at *4 (M.D. Fla. May 9, 2014) ("Even minor offenses, such as misdemeanors or traffic violations, may be the basis for a full custodial arrest.").  The Eleventh Circuit has specifically rejected the argument advanced by the Defendant that an arresting officer must have personal knowledge of the facts used to generate probable cause in order to effectuate a traffic stop and arrest.  *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012).  Here, the DEA task force members had sufficient probable cause to arrest the Defendant (as laid out in the Criminal Complaint) for conspiracy to

---

[7] Although the Defendant argues Deputy Wight arrested the Defendant, it was Detective Dyal who escorted the Defendant to the rear of the vehicle, handcuffed him, and placed him in Deputy Wight's cruiser.  Regardless of who arrested the Defendant, the Court's analysis on this issue remains the same.

distribute methamphetamine, and that knowledge was sufficiently imputed to Deputy Wight. *Id.* ("[B]oth the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer."); *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998) (rejecting the defendant's argument that the subject evidence should be suppressed because "the officers who actually stopped his car were not members of the task force" who had observed the suspicious activity); *United States v. Burton*, No. 3:13-cr-50-J-34TBT, 2013 WL 5954727, at *9 (M.D. Fla. Sept. 6, 2013) ("Per controlling case law, the relevant inquiry is not whether Trooper Cimino personally observed acts justifying reasonable suspicion, but whether the DEA agents who ordered the stop observed such acts and asked FHP for assistance."), report and recommendation adopted in 2013 WL 5954722 (M.D. Fla. Nov. 4, 2013), *aff'd*, *United States v. Burton*, 594 F. App'x 597 (11th Cir. 2015).

The Defendant's second argument, made generally, that the Government needed a warrant before arresting him, also lacks merit. The Fourth Amendment does not require that law enforcement officers secure a warrant before making a felony arrest, so long as probable cause exists. *See United States v. Watson*, 423 U.S. 411, 415-17 (1976). Here, probable cause clearly existed for the

officers to arrest the Defendant.[8]  Thus, no warrant was required to arrest the

Defendant for conspiracy to distribute methamphetamine.  *Cf. United States v.*

*Goddard*, 312 F.3d 1360, 1362 (11th Cir. 2002) (recognizing that the Fourth

Amendment permits warrantless arrests in public places where an officer has

probable cause to believe that a felony has occurred).

## B.    The Vehicle Search Was Permissible

The Defendant next argues that the officers impermissibly seized his

vehicle when they drove it back to BCSO and searched it subsequent to his

arrest.  The Defendant cites the case of *Arizona v. Gant*, 556 U.S. 332 (2009) in

support of his argument.  The Defendant focuses on the Supreme Court's

holding in *Gant* that law enforcement officers are authorized to search a vehicle

incident to a recent occupant's arrest *only* when the arrestee is unsecured and

within reaching distance of the passenger compartment at the time of the search.

---

[8] The Complaint and suppression hearing revealed that: (a) the Defendant was connected to a storage unit containing crystal methamphetamine; (b) officers obtained information that additional methamphetamine was en route to Jacksonville via the Defendant's courier, Ms. Ramirez-Chavez; (c) the Defendant and another individual purchased a white Lexus sedan on August 27, 2017; (d) the Defendant and Ms. Ramirez-Chavez's phones were pinged within extremely close proximity (in Mesa, Arizona) for several hours on October 4, 2017; (e) Ms. Ramirez-Chavez traveled eastbound towards Jacksonville on October 6, 2017; (f) officers observed Ms. Ramirez-Chavez driving a white Lexus sedan on October 9, 2017; (g) officers arrested Ms. Ramirez-Chavez that day and a search of a hidden compartment in her vehicle contained crystal methamphetamine; (h) Ms. Ramirez-Chavez implicated the Defendant in drug activity on that date; (i) officers tracked the Defendant traveling from Texas to Jacksonville, Florida, on October 17, 2017.  (Doc. 89-3; Tr. 31-44, 63-65, 67-68, 92-93, 152-55.)

556 U.S. at 343.  The Defendant asserts that because he was restrained and driven away from the scene in a police cruiser, the officers had no basis to search his vehicle incident to arrest.

However, the Supreme Court in *Gant* also "conclude[d] that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004)). Unlike in *Gant*, the law enforcement officers here had a reasonable basis to believe that evidence of a drug crime might be found in the Defendant's vehicle incident to his arrest.  Thus, it was permissible for the officers to search the Defendant's vehicle incident to arrest.

The search of the Defendant's vehicle was also permissible under the automobile exception to the warrant requirement.  The automobile exception authorizes a search of a vehicle if "(1) the vehicle is readily mobile; and (2) the police have probable cause for the search."  *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007).  The fact that the Defendant was pulled over on Interstate 10 shows that the vehicle was operational.  The totality of the circumstances as described in footnote 8 of this Report and Recommendation (as well as the fact that officers observed the Defendant purchase the vehicle with what they believed to be drug proceeds) clearly shows that "probable cause

existed to believe the vehicle, which was being used as an instrument of drug-trafficking activity, contained additional evidence of drug-trafficking activity, such as drug paraphernalia, cash, or records of drug transactions, among other things." *United States v. Alston*, 598 F. App'x 730, 734 (11th Cir. 2015) (citing *United States v. Brazel*, 102 F.3d 1120, 1146-47 (11th Cir. 1997)).  The officers were supplied with probable cause to search the vehicle once more after K-9 "Blitz" sniffed the vehicle and alerted agents to the presence of narcotics.  *See United States v. Tamari*, 454 F.3d 1259, 1264-65 (11th Cir. 2006).  Thus, the officers lawfully performed a warrantless search of the vehicle under the automobile exception.

### C.    The Ping Orders Were Lawfully Obtained

Finally, the Defendant argues that the ping orders issued by the state circuit judges were unlawful.  The undersigned disagrees.  An issuing judge's probable cause determination will be upheld if there is a substantial basis for concluding that probable cause existed.  *United States v. Green*, 40 F.3d 1167, 1171-72 (11th Cir. 1994).  An issuing judge's probable cause determination is entitled to "great deference" by a reviewing court.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).

Here, Judges Aho and Senterfitt each had a substantial basis for concluding that probable cause existed to issue the ping orders.  Namely, the

affiant, TFO Hague, obtained information from a confidential source on August 16, 2017 regarding crystal methamphetamine that was seized during the search of a storage unit in Jacksonville, Florida.  (Docs. 89-1 at 1, 89-2 at 1.)  The confidential source identified the supplier as the Defendant and provided his specific cell phone number.  (*Id.*)  On August 17, 2017, the confidential source called the cell phone, and asked the Defendant about obtaining more crystal methamphetamine and about potential delivery.  (*Id.*)  The Defendant advised he was en route to Jacksonville within the next few days and would contact the confidential source.  (*Id.*)  Records revealed that the cell phone was an active T-Mobile phone subscribed to the Defendant, and indicated regular use of the cell phone during the relevant time periods.  (*Id.* at 2.)  Judges Aho and Senterfitt properly issued the ping orders.

The Defendant also argues that the ping orders were deficient because his phone was not located in Jacksonville at the time they were issued.  He cites the requirement in Rule 41 that the person or property be located within the district prior to issuance of the warrant.  *See* Fed. R. Crim. P. 41(b).  However, the Defendant's argument "fails to address the broader geographic authority conferred by the [Stored Communications Act, 18 U.S.C. Section 2703, *et seq.*] in the context of a search warrant for stored electronic communications from an appropriate service provider."  *United States v. Mozee*, No. 1:15-cr-434-WSD-

JSA, 2016 WL 11440139, at *2 (N.D. Ga. June 14, 2016) (citing *United States v. Bensal*, 663 F.3d 634, 662 (3d Cir. 2011) (rejecting argument that "Rule 41(b) which limits a Magistrate Judge's jurisdiction to the District in which he or she sits, trumps § 2703(a)") & *United States v. Berkos*, 543 F.3d 392, 398 (7th Cir. 2008) (holding that the geographic limitation of Rule 41(b) does not apply to warrants under the Stored Communications Act)).  Thus, the undersigned rejects the Defendant's argument.[9]

## IV.    Conclusion

The undersigned finds that the Defendant's arrest and the search of his vehicle were lawful.  Further, the undersigned finds that the ping orders were lawfully obtained.  Therefore, the Defendant's suppression arguments must fail.

Accordingly, it is respectfully

**RECOMMENDED**:

Defendant's Motion to Suppress (**Doc. 43**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on August 30, 2018.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

---

[9] Even if the judges erred in issuing the ping orders (which they did not), the undersigned finds that the officers obtained the evidence through objective good faith reliance on the ping orders under *United States v. Leon*, 468 U.S. 897, 913 (1984).

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record